Honorable Ronald B. Leighton

1

2

3

4

5

6

7       **IN THE UNITED STATES DISTRICT COURT**
       **WESTERN DISTRICT OF WASHINGTON, AT TACOMA**
8

9    PHILLIP L. McDANIEL, a married man,     )    NO.  3:10-cv-05120-RBL
                                             )
10                 Plaintiff,                )
                                             )
11          v.                               )    PLAINTIFF'S RESPONSE TO
                                             )    DEFENDANTS' MOTION
12   LEWIS COUNTY FIRE PROTECTION            )    FOR SUMMARY JUDGMENT
13   DISTRICT NO. 8, a political subdivision )
     and municipal corporation of the State of )
14   Washington, LEWIS COUNTY FIRE          )
     PROTECTION DISTRICT NO. 8 BOARD        )
15   OF COMMISSIONERS, ANNE PIPER,           )
16   THE MARITAL COMMUNITY OF               )
     ANNE PIPER AND JOHN DOE PIPER,         )
17   SHARON DEBUHR, THE MARITAL             )
     COMMUNITY OF SHARON DEBUHR             )
18   AND JOHN DOE DEBUHR, GEORGE            )
19   KAECH, THE MARITAL COMMUNITY           )
     OF GEORGE KAECH AND JANE DOE           )
20   KAECH,                                  )
                                             )
21                 Defendants.               )
22                                           )

23                             I. <u>INTRODUCTION</u>

24          Plaintiff Phillip McDaniel's claims allege breach of contract, wrongful termination,

25   and defamation in violation of the Civil Rights Act of 1871.  Underlying all these claims

26

27   PLAINTIFF'S RESPONSE TO DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT - 1
     [Case No. 3:10-cv-05120-RBL]

1  is the abuse of political power intended to deprive a dedicated public servant of his

2  livelihood and strip him of his dignity, abuse of power used to aggrandize the status of

3  elected officials and give them an excuse to renege on a public contract. The totality of the

4  evidence will reveal that defendant Lewis County Fire Protection District #8, through its

5  defendant commissioners, totally ignored and acted outside the clear requirements of the

6  Washington Open Public Meetings Act by unjustly and inaccurately criticizing plaintiff

7  McDaniel's performance, removing him from his duties and responsibilities, terminating

8  him in violation of his lawful and binding employment agreement, failing to pay him the

9  amount due to him under that agreement, and publicly humiliating him in the community.

10 The record submitted to the Court by defendants and with this response shows that there

11 is a genuine dispute as to virtually all of the material facts and that, as a result, defendants

12 are not entitled to judgment as a matter of law on his breach of contract and defamation

13 claims. For the reasons below defendants' motion as to these claims should be denied.

## II. STATEMENT OF FACTS

A.   PHILLIP McDANIEL'S BACKGROUND.

1. His early life and work history outside the fire service.

Plaintiff Phillip McDaniel ("McDaniel") is 58 years old. Phillip McDaniel dep., TR 7:25-8:1 (Rosen).[1] He was born in Lewis County, Washington and has lived there all his life other than for a few years when he lived in Portland, Oregon with his mother after his parents divorced when he was a child. McDaniel decl., ¶ 2. He graduated from

---

[1] Excerpts of depositions are attached to the declarations of counsel for both the plaintiff and defendants. We will identify in which declaration the particular citation will be found.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 2
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

Mossyrock High School in 1970. McDaniel dep., TR 11:22-12:1 (Rosen). He immediately thereafter began working for the family telephone company as a lineman, eventually becoming a line foreman supervising a crew of workers. McDaniel dep., TR 37:13-38:15 (Macario). In about 1995 McDaniel's father and uncle's family (his uncle had had a severe stroke) sold McDaniel Telephone Company to TDS Telecom. *Id.*, TR 36:17-22. McDaniel then became an employee of TDS Telecom still as a line foreman until about 1998 when he became the local plant manager for the company. *Id.*, TR 38:16-39:7. Faced with an uncertain future at TDS and unsure whether he was going to be able to retain his plant manager position at the company in Lewis County or be demoted, and having an opportunity to be employed by defendant Lewis County Fire Protection District #8 as its full-time fire chief, he chose to retire from TDS Telecom in 2006 after more than thirty-five years with the combined companies.[2] *Id.*, TR 39:18-24, TR 63:18-22; McDaniel Decl., ¶ 4.

      2.   <u>McDaniel had spent much of his teen years and all of his adult life volunteering for and then being employed by Lewis County Fire Protection District #8.</u>

McDaniel's family was one of the founding families of Lewis County Fire Protection District No. 8 ("District"). McDaniel declaration, ¶ 5. At the age of sixteen he officially became a volunteer fire fighter having "tagged along" for a number of years with his father who was then the fire chief for the District. McDaniel dep., TR 43:9-16 (Macario). In 1971 McDaniel obtained his EMT certification working his way up through

---

    [2] For twenty-seven of the thirty-five years that he was employed by the telephone companies McDaniel served in the Air Force Reserve retiring in about 1997 with the rank of Master Sargent. McDaniel declaration, ¶ 3.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 3
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   the ranks until he was appointed fire chief by the then board of commissioners in 1989.[3]

2   *Id.* TR 43:19-47:15.

3       McDaniel continued as the volunteer fire chief for the next seventeen years earning

4   the respect of not only the commissioners, fire fighters and Emergency Medical

5   Technicians (EMT) of the District, but of the commissioners and chiefs throughout the

6   County.  Kris Weiland dep., TR 35:22-37:20; Lenny Ryerson dep., TR 23:24-25:13;

7   Patrick O'Neill, M.D. dep., TR 26:10-13; W. Duran McDaniel dep., TR 26:6-17.  No doubt

8

9   influenced and entailed by his family's role in the founding of the District as well as by his

10  father's role as chief and mentor, McDaniel took great pride in his role as chief.  McDaniel

11  declaration, ¶ 7.  He spent several hours a day volunteering his time and energies fulfilling

12
    responsibilities of fire chief of a large rural district.  *Id.*  He and the District were fortunate
13
    that his employers, McDaniel Telephone and then TDS Telecom, were model corporate
14
15  citizens allowing him the time away from his job when necessary to protect life and

16  property in the District. *Id.*  McDaniel became known as an outstanding chief, the best at

17  a fire scene, assuring the safety of his fire fighters who placed their faith in his abilities and

18  were the beneficiaries of his skills and knowledge.  Dave DeBuhr dep., TR 35:24-36:16;
19
    Ricky Wood dep., TR 26:19-27:21; Lenny Ryerson dep., TR 39:5-16.
20

21        3.   McDaniel is hired in 2006 by the District as its full-time paid chief and
               serves professionally and competently until he is terminated unlawfully and
22             without cause in August 2009.

23        As the population in the District grew the responsibilities of the fire department

24  _____

25      [3] McDaniel's father retired as fire chief in the mid-1980s.  Upon his retirement
    the Board filled the chief position with Ron Wright and then Roy Ridenour who served
26  successively for about four years prior to the appointment of McDaniel by the Board.

27  PLAINTIFF'S RESPONSE TO DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT - 4
    [Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

expanded and became more complex. Additions were built, fire fighting and emergency medical equipment was added, and the number of volunteers increased. McDaniel decl., ¶ 5. Defendant Commissioner Piper saw a need for hiring a full-time paid chief and began pushing for it. McDaniel dep., TR 54:24-56:2 (Macario). The discussions became more formal when the commissioners learned that McDaniel's continuing employment at TDS was uncertain and that he might be persuaded to take on the position of full-time paid chief. *Id.*, TR 63:1-64:15. The commissioners approached McDaniel about assuming the role of paid chief who told them that he was interested in exploring the possibility. *Id.* He was encouraged by the commissioners to research employment agreements and come back to them with a proposal. Macario decl., Exh. D. He did so in June 2006 at which time the commissioners discussed his proposed employment agreement among themselves and in July decided to send it to their attorney for review and advice. *Id.*, Exhs. D and E. After some modifications were made the agreement was adopted by the commissioners at its August 14, 2006 meeting. *Id.*, Exh. F. Thereafter, at its next meeting on September 11, 2006 it passed a resolution changing the department "from an all volunteer department to one with a paid fire chief." Rosen decl.,¶ 4, Exh, 2.

The agreement executed in August 2006 was for approximately a one year period from September 1, 2006 through September 5, 2007. Macario decl., Exh. H. During this first year of employment, freed from the constraints placed on him in his prior part-time volunteer role, he worked tirelessly on behalf of the District. McDaniel decl., ¶ 8. His efforts were rewarded with a $5,000.00 bonus in April 2007 at which time the commissioners noted that he "had made good progress on the transition and in the performance of his duties to date." Rosen decl., ¶ 4, Exh. 3.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5
[Case No. 3:10-cv-05120-RBL]

In August 2007 the commissioners, recognizing that the chief's contract was due to expire, sought McDaniel's suggestions for a new employment agreement and during their monthly meeting went into executive session after having received Chief McDaniel's requests. Macario decl., Exh. I. At its September 10, 2007 meeting the board offered McDaniel a new five year contract which he accepted and which was then adopted by formal motion of the commission. *Id.*, Exh. J; Exh. R. At that same meeting McDaniel was provided with an annual performance appraisal as required by his agreement. This appraisal sets forth some of McDaniel's many contributions during his first year of full-time employment concluding that he "has performed in a very satisfactory way." Defendant Commissioner Piper added a handwritten note that reads "Thanks for a great first year."[4] *Id.*, Exh. L.

The new contract, effective September 1, 2007 through August 31, 2012, set the Chief's starting salary at $50,000.00, a $5,000.00 increase from the previous one year agreement. It contained a provision for a negotiation of annual increases but none were mandated. *Id.*, Exh. K.

During the first year of his new contract Chief McDaniel continued to perform his responsibilities, as set forth in an addendum to the agreement entitled "**Fire Chief Job Description/Duties**." *Id.* Despite the fact that he had a serious ATV accident while

---

[4] The task of drafting the annual performance evaluation was assigned by the board of commissioners to its secretary, Mike Tamble. Mr. Tamble prepared the evaluation using information from commission meetings, from information he obtained from the different commissioners, from information he gathered regarding his own participation in activities, and from Chief McDaniel himself. Tamble dep., TR 57:2-15 (Rosen).

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6
[Case No. 3:10-cv-05120-RBL]

1    vacationing at the sand dunes on the Oregon coast during the 2007-08 new year holiday,[5]

2    he typically worked fifty to sixty hours a week.  McDaniel dep., TR 69:9-20 (Macario);

3    McDaniel decl., ¶ 9.

4          It took McDaniel about a month to get back on his feet and resume his entire

5    panoply of duties after his accident.  However, despite the seriousness of his injuries he

6    continued to perform daily duties from home and remained in touch through phone and

7    meetings with Assistant Chief Dave DeBuhr, District Secretary Tamble, and others.  Rosen

8    decl., ¶ 6, Exh. 5; Tamble dep., TR 28:3-25 (Rosen); Dave DeBuhr dep., TR 68:1-19

9    (Macario); McDaniel decl., ¶ 10.  Secretary Tamble regularly brought department mail to

10   the Chief at his home and by the January 14, 2008 board meeting assistant chief DeBuhr

11   reported that McDaniel "is capable of doing light duty jobs, many of which can be done

12   from home."  By the February meeting a month later, McDaniel was back in full command

13   and continued to be so through the end of his first contract year.  McDaniel decl., ¶ 10.

14         At the July 14, 2008 board meeting the commissioners went into executive session

15   and after returning they agreed to amend McDaniel's agreement by increasing his salary

16   by $2,500.00.  Rosen decl., ¶ 7, Exh. 19.  The commissioners acted on that agreement by

17   passing a resolution at the following meeting on August 11, 2008.  *Id.*, ¶ 7, Exh. 6.

18         Up through the end of the conclusion of McDaniel's second year as a full-time paid

19   chief for the District, he had received only praise, recognition and commendations for his

20   efforts and many accomplishments.  McDaniel decl., ¶ 11. That changed immediately after

---

[5] The Chief suffered very serious injuries that resulted in hospitalization.  A crew of volunteer EMTs from the District drove an ambulance to pick up the Chief and return him to Lewis County after he spent a few days in the hospital.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 7
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   September 1, 2008 when defendant Sharon DeBuhr was elected by defendant

2   commissioners Piper and George Kaech to fill the third position held by Bill Wood Sr. who

3   submitted his resignation at the meeting effective at the end of that month. McDaniel dep.,

4   TR 184:21-185:7 (Rosen).

5       At the first meeting on September 8, 2008 of the newly constituted board of

6   commissioners, defendants Piper, Kaech and DeBuhr voted to continue the meeting for two

7   days in order to go into an executive session "for personnel discussions." Rosen decl., ¶ 8,

8   Exh. 7. The three met on September 10, 2008 for that purpose and when they reconvened

9   an hour later they adjourned the meeting. During the executive session defendant DeBuhr

10  began criticizing McDaniel's performance as chief. No notes or minutes of that executive

11  session were made until the end of October 2008 yet these were never shared with

12  McDaniel. Macario decl., Exh. Q; Piper Dep., TR 169:14-170:13 (Rosen).

13      Although, in accordance with the employment agreement, McDaniel was to receive

14  his performance evaluation at the end of his second year, in September 2008, he did not

15  receive the performance evaluation until the November 2008 meeting. However, between

16  the date defendant DeBuhr became commissioner and the evaluation McDaniel's

17  relationship with the commission turned 180° from one where he was treated with respect

18  and professionalism to one in which there were repeated accusations of wrongdoing and

19  incompetency made by commissioners Piper and DeBuhr. The accusations culminated in

20  the November 10, 2008 evaluation which is about as derogatory and inflammatory as it is

21  inaccurate. Macario decl., Exh. R.

22      The defendant commissioners continued their barrage of criticisms, both oral and

23  written, during the ensuing months. Almost all of the directives violated the employment

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1  agreement such as his inability to use "comp time" as had been allowed for the first two

2  years of his employment agreement, Piper dep., TR 124:18-21 (Rosen), the new

3  requirement that he keep a daily log (and then later a weekly log) of his activities despite

4  that his job responsibilities required only an "annual report" and that he regularly provided

5  a report to the commissioners at their monthly meetings where he detailed many of the

6  activities in which he had been involved and items that needed attention during the prior

7  month.[6]  He was told that he had to recompute the sick leave that he had taken during

8  January and February 2008 after his accident even though he worked virtually every day

9  after his return home from the hospital during his convalescence and was an exempt,

10  salaried employee, Piper dep., TR 126:6-25 (Rosen).

11          Despite the chief's best efforts to comply with the unreasonable expectations of the

12  newly constituted board of commissioners, they were not satisfied.  See Motion for

13  Summary Judgment and the record, *passim*.  They accused him of not spending enough

14  time on District business, on using District property for personal and business purposes,

15  and, ultimately, of insubordination.  The accusations are unfounded and in no way support

16  the decision of the defendant commissioners to terminate McDaniel.

17          On June 13, 2009 McDaniel received a telephone call from Commissioner Piper

18  while he was at a nephew's high school graduation in the Seattle area.  She told him that

19  she wanted the password to the computer in his office at the fire station.[7]  When the chief

---

24      [6] The minutes in the record provides a snapshot of the myriad of subjects
25  McDaniel reported to the Board on a month basis so as to keep them fully informed as
    to his activities.

26      [7] After months of the seemingly ceaseless barrage from the commissioners,
27  McDaniel recognized that they were setting him up for termination and asked George

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1  asked Piper why she needed the password she told him that she needed to set up some

2  receipts and make a copy.  He reminded her that there was an adding machine in his desk

3  drawer and that the copy machine was right on his desk.  He questioned her again as to why

4  she needed the password.  Rather than respond to him she became furious at him and

5  terminated the call.  McDaniel dep., TR 142:20-145:5 (Macario).  Late that night when

6  McDaniel was returning to his home from the graduation he observed Piper's car in the

7  parking lot of the fire station and could see her and her husband through his office window.

8  McDaniel dep., TR 149:13-150:25 (Macario).

9

10       When McDaniel arrived at work on Monday, June 15, he was met by the three

11  commissioners who gave him a letter placing him on administrative leave.  When he asked

12  why he was told that they could not comment or talk to him and that they were seeking

13  legal counsel.  McDaniel was then again asked for the password to his computer.  Again

14  being concerned that they might "plant" something on the computer he told them that he

15  felt that he could not provide the password until he had an opportunity to speak to counsel

16  as they were doing.  That effectively ended the conversation and McDaniel left the station

17  with his personal belongings as soon as he was able to.  McDaniel dep., TR 147:20-148:12,

18  155:2-25 (Macario).

19

20       On Tuesday, June 16, Mike Tamble, the district secretary, hand-delivered a letter

21  directing McDaniel to divulge the password.  He immediately responded in writing to the

22  commissioners telling them that he believed that he "should be given the same courtesy to

23

24  _____

25  Penzenik, one of the volunteers knowledgeable in computer technology, to help him
26  change the password for the computer so that the commissioners could not place
   material on the computer that would give them a basis to take disciplinary action.
27  McDaniel dep., TR 100:21-101:13, 103:11-24 (Rosen), TR 112:2-115:27 (Macario).

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    seek and be directed by legal counsel" as they were indicating to him that they were doing.

2    The password was provided on June 23, 2009.  Macario decl., Exhs. BB, DD and FF.

3         On July 13, 2009, the commissioners sent a *Loudermill* notice to McDaniel

4    charging him with insubordination, inappropriate use of public resources, and the failure

5    to adequately perform his job duties.  Macario decl., Exh. II.  Subsequently, McDaniel

6    received an unsigned memorandum from the commissioners advising him that his

7    employment was being terminated effective August 4, 2009.  *Id.*, Exh. LL.  Neither any

8    request for the password, the removal of McDaniel's duties and placement on

9    administrative leave, the *Loudermill* hearing, nor the unsigned memorandum terminating

10   McDaniel were taken or ratified during any open and lawful meeting of the board of

11   commissioners.  Macario decl., Exh. Z (June 14, 2009 minutes); Rosen decl., Exhs. 8-13

12   (minutes from June 16, June 21, July 2, July 13, August 10, and September 13, 2009).

13   

14        Subsequent to the termination the District and commissioners released the contents

15   of the *Loudermill* notice to the press knowing when they prepared it that its contents were

16   false, misleading and damaging to McDaniel.

17   **B.    THE HISTORY OF LEWIS COUNTY FIRE PROTECTION DISTRICT #8.**

18        The District was founded in 1960 by a group of citizens including McDaniel's

19   father and grandfather.  The founders were all farmers and local businessmen.  Over the

20   years the size of the district in terms of square miles, population, structures, number of

21   volunteers, number of fire stations and fire equipment has all increased markedly.  The

22   District encompasses two hundred square miles of small communities, farm land, water

23   ways and forests.  Its topography is farm land, rolling hills, forests and flood plains.

24   Highway 12, the main thoroughfare through the county with access to Eastern Washington

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 11
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    courses through the middle of the District.  McDaniel decl., ¶¶ 5, 6.

2         Over the years as Chief McDaniel developed close working relationships both

3    within and without the District.  McDaniel developed strategic automatic response

4    agreements with neighboring districts to ensure rapid and effective responses to

5    emergencies regardless of in which jurisdiction they occurred.  He developed close

6    working relationships with the other fire chiefs in Lewis County and was considered a

7    leader within the fire chiefs association. He garnered the respect of not only his peers and

8    the volunteers in the District but of the medical program director for emergency services

9    in Lewis County, Patrick O'Neill, M.D.  As paid chief he became an integral member of

10   the county incident management team, a role the commissioners encouraged him to fill

11   when he was first appointed to the paid position in 2006.  Weiland dep., TR 19:20-21:9,

12   22:17-24:8, 35:22-37:20; O'Neill dep., TR 13:2-18:9; Ryerson dep., TR 22:2-25:13.

13        During McDaniel's tenure as fire chief, additional fire stations were constructed so

14   that by 2008 there were five separate stations in strategic parts of the district.  Each had

15

16   equipment and volunteers assigned to them, all of which and whom were monitored and

17   overseen by McDaniel.  With McDaniel as fire chief the District developed and maintained

18   a reputation of being the finest in the county. D. DeBuhr dep., TR 38:8-17 (Rosen); Kaech

19

20   dep., TR 63:13-65:17.

21        Unlike many of the other districts in the county, it enjoyed stability in its volunteer

22   force, contributing to its excellence.  This was no easy task given the fact that the fire

23

24   fighters and EMTs volunteered their time and energy to not only respond to emergencies

25   but to attend weekly evening training sessions, practice burns, and the like.

26        Again, those responsibilities as fire chief took him on a daily basis both within and

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   without the district to monitor work at the remote stations within the district and to attend

2   meetings with his colleagues, county commissioners, citizens, groups and committees.

3   Weiland dep., *passim* (Rosen); D. DeBuhr dep., TR 37:15-38:3 (Rosen); McDaniel decl.,

4   ¶¶ 13, 14.

5        In performing maintenance at the district McDaniel often used extensive personal

6   equipment making it unnecessary for the District to expend resources.  McDaniel did this

7

8   voluntarily and with no expectation of remuneration.   McDaniel dep., TR 62:18-24

9   (Macario); McDaniel declaration, ¶ 15.

10  C.   <u>PUBLIC MEETINGS AND THE AUTHORITY OF THE BOARD OF
     COMMISSIONERS TO ACT</u>.

11

12       The District is organized under Title 52 of the Revised Code of Washington.  In

13  accordance with law the board of commissioners holds regular monthly meetings and is

14  empowered to convene special meetings upon meeting specified conditions set forth in the

15  law.

16       The board of commissioners is constrained to take action only in accordance with

17

18  the Washington Open Public Meetings Act.  Actions taken in violation of that Act are null

19  and void. RCW 42.30.060. While there are emergency circumstances that could allow the

20  board of commissioners to dispense with the notice requirement for special meetings, the

21  emergencies must involve "injury or damage to persons or property or the likelihood of

22  such injury or damage, when time requirements of the notice would make notice

23

24  impractical and increase the likelihood of injury or damage." RCW 42.30.080.  Even in

25  emergency situations the meeting must be open to the public. These statutory requirements

26  were not met by the board of commissioners when it placed McDaniel on administrative

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   leave, directed him to provide the password to the chief's office computer, held the

2   *Loudermill* hearing, and took action to terminate his employment.

3       III.  <u>STATEMENT OF SPECIFIC FACTS CREATING GENUINE
        ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT</u>

4

5   A.   <u>THE COMMISSIONERS INITIATED DISCUSSIONS ABOUT CONVERTING
        THE FIRE CHIEF POSITION FROM VOLUNTEER PART-TIME TO PAID
        FULL-TIME, NOT McDANIEL.</u>

6

7       Defendants contend that because McDaniel's "employment with TDS was

8   questionable" it was he who first approached the commissioners regarding conversion of

9
    the chief position to one that was a full-time paid job.  Defendants' Motion for Summary
10
    Judgment, TP 3:14-4:4, citing various portions of McDaniel's deposition.  However,
11

12  defendants fail to note his testimony just prior to the portions cited in which he testified

13  very definitely that it was the commissioners that first discussed the topic.  McDaniel dep.,

14  TR 63:1-22 (Macario).  McDaniel made it clear in his deposition that it was defendant

15  Piper who first raised the subject.  *Supra* at 5.

16
        The minutes of the June 12, 2006 board meeting are consistent with McDaniel's
17

18  testimony.

19      **NEW BUSINESS:**

20  Commissioner Piper reported that she feels the district is reaching a point
    where a full time paid chief is needed.  Comm Brannan stated he felt that
21  the needs of the district are increasing and a full time chief is appropriate.
    Asst. Chief DeBuhr related that many times our district misses out on
22  meetings due to the fact there is no one available for attendance or input.
    Discussion centered on how large the district has gotten, additional
23  requirements from the state, managerial oversight and how we are being
    hurt by not having a full paid chief.  Comm Woods also related that he feels
24  the size of the district plus new rules and regulations necessitates the need
25  for a full time paid Chief.

26
        Chief McDaniel stated that currently he is in a situation where he might be
27

1   able to consider the position on a full time basis. He asked for 2 weeks to
2   discuss with his family and develop a proposal/contract for presentation to
    the Commissioners. Chief asked that the decision not be drawn out over a
3   long period of time. He is on vacation from June 8 to June 17, 2006.

4   Macario decl., Exh. D.

5       Despite the fact that TDS Telecom might have been contemplating a reorganization

6   there is no evidence to suggest that McDaniel would not have been retained as an employee

7   in some substantial capacity as his performance evaluation at TDS a few months earlier

8   graded him as "successful" and in June he received a 3% merit increase. McDaniel decl.,

9   ¶ 4, Attachments 1 and 2. He did not resign from TDS until after his contract with the
10
    District was unanimously accepted by the commissioners. Macario decl., Exh. F.
11

12  B.    **THE DISTRICT'S RATIONALE FOR ITS DECISION THAT A FULL-TIME**
        **PAID CHIEF WAS NEEDED IS INACCURATE AND MISLEADING**.
13

14      In their summary judgment motion defendants state that the board voted to accept

15  a full-time contract with McDaniel "because it felt that many important tasks were not

16  being completed when McDaniel was a volunteer fire chief." Motion at 4, citing

17  Declaration of Anne Piper. This is misleading as it suggests that somehow Chief McDaniel

18  was at fault for not completing tasks. This is inconsistent with the purposes for hiring a

19  full-time chief set forth by the board in its June 12 minutes. Macario decl., Exh. D. The
20
    rationale of the commissioners was not that "many important tasks were not being
21
    completed" but that "the needs of the District are increasing . . . many times . . . [the] our
22
23  District misses out on meetings due to the fact that no one is available . . . how large the

24  District has gotten, additional requirements from the state . . . and how we are being hurt

25  by not having a full paid chief . . . the size of the District plus new rules and regulations .
26
    . . ." *Id.*
27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

C.   WHILE THE EMPLOYMENT AGREEMENT SETS OUT THE REASONS FOR WHICH McDANIEL COULD BE TERMINATED FOR CAUSE, IT ALSO CONTAINS A PROVISION THAT REQUIRES THE DISTRICT TO CONTINUE TO PAY McDANIEL'S SALARY EXCEPT UNDER VERY PROSCRIBED CIRCUMSTANCES.

Both the first and second employment agreements contain identical articles pertaining to termination "for cause." Macario decl., Exh. H; Exh. K. This provision is not a model of clarity, to say the least, because while after the provision describes the various causes it goes on to read:

> If the Board of Commissioners wishes to terminate the Fire Chief without cause (for reasons other than Gross misconduct or insubordination or criminal activity), during the term of this Agreement, the District shall be held liable for the annual salary til [sic] the expiration of this Agreement.

*Id.* Thus, it appears that the parties contemplated that unless the cause was determined to be "Gross misconduct or insubordination or criminal activity" the District had to continue to pay McDaniel his salary.[8]

D.   DEFENDANTS ARE MISLEADING IN ALLEGING THAT McDANIEL "PRESSED" THEM TO GIVE HIM A FIVE YEAR CONTRACT IN AUGUST 2007.

At the August 13, 2007 meeting of the board it was Commissioner Piper who "advised that the fire chief's contract was due for review and renewal." It was only after this comment and the decision of the commissioners to adjourn for purposes of going into an executive session at a later date that McDaniel "presented his ideas for a new contract." Thereafter, when the meeting reconvened on August 16, McDaniel presented his "requests"

---

[8] McDaniel did not "draft" the agreement.  Rather, he obtained some templates which were worked on and modified by the commissioners and Mike Tamble and reviewed by the Board's attorney. Tamble dep., TR 52:10-23 (Rosen); Macario decl., Exhs. D and E.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 16
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   for a new contract. The board directed its secretary to write up the new contract and draft

2   a resolution authorizing the changes. Macario decl., Exh. I.

3   E.   **THERE WERE NO "SIGNIFICANT PROBLEMS WITH McDANIEL'S**
       **MANAGEMENT" EITHER BEFORE OR AFTER THE PARTIES ENTERED**
4      **INTO THE 2007-2012 EMPLOYMENT AGREEMENT.**

5          First, whether there were ever any "significant problems with McDaniel's

6   management" is a question of fact. Here, of course, it is a particularly material fact since

7   defendants rely, at least in part, on his performance as chief in making the decision to

8   terminate the employment agreement.

9          One of the few specific examples defendants cite is the alleged concern that EMT

10  Patricia Newcomer had with regard to the condition of training mannequins. Motion, 6:6-

11  17. However, rather than this issue being recent, or at least some time after the alleged

12  "word of his misconduct as the chief began to reach the board," Ms. Newcomer testified

13  that the issue with the mannequin goes back many years. Newcomer dep., TR 21:1-2

14  (Macario). She was unable to pinpoint when she first went to Commissioner Piper other

15  than to recollect that it was at the time that John Brannan and Keith Ulery were also

16  commissioners. Mr. Ulery, in fact, was only a commissioner through December 2005.

17  Rosen decl., Exhs. 14 and 15. Moreover, Commissioner Piper had no recollection of when

18  Ms. Newcomer discussed "her issues" with her. Piper dep., TR 96:11-15 (Macario).

19  Clearly, it was well before the execution of the 2007-2012 agreement.

20         Defendants assert that "other volunteers also complained." Motion, 6:18. They cite

21  the testimony of Commissioner Piper that Duran McDaniel and Mel Kortlever complained

22  about oil in the fire engines being "muddy and old." However, they provide no evidence

23

24

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'            THE ROSEN LAW FIRM
MOTION FOR SUMMARY JUDGMENT - 17              Suite 1200 Hoge Building 705 Second Avenue
[Case No. 3:10-cv-05120-RBL]                         Seattle, WA 98104-1798
                                                        (206) 652-1464

1   from Duran McDaniel to support this hearsay statement.[9]  Directly contrary to Piper's

2   testimony, Mr. Kortlever testified that "minor maintenance [including oil changes] would

3   be the responsibility of the station chief, of which he was one." Kortlever dep., TR 12:22-

4   13:10; 23:2-24.

5

6        These so called "significant" shortcomings in McDaniel's performance need to be

7   compared to the testimony of Lenny H. Ryerson and Ricky G. Wood, two other station

8   chiefs for the District.  Ryerson dep., TR 11:13-18, 23:17-25:21, 30:5-34:14, 39:2-40:11;

9   Wood dep., TR 11:3-14:2, 20:4-21:17, 26:13-27:21.  Similarly, the testimony of both

10   neighboring fire chief Chris Weiland and Dr. O'Neill, the medical program director for

11   emergency medical services in Lewis County, create significant issues of material fact with

12   regard to McDaniel's performance.  Weiland dep., TR 5:13-6:1, 19:20-21:9, 22:21-24:5,

13   33:10-25, 35:6-39:3; O'Neill dep., TR 6:13-19, 7:19-25, 15:15-16:8, 17:6-18:9, 19:11-

14   20:18, 21:12-24:1, 24:13-25:8, 25:23-26:17.

15

16   F.   <u>DEFENDANTS' CRITICISM OF McDANIEL OCCASIONALLY SPENDING
TIME WORKING ON HIS CHRISTMAS TREE FARM IS MISPLACED SINCE
VIRTUALLY EVERYONE KNEW ABOUT HIS TREE FARM AND THE
CONTRACTS WERE NEGOTIATED IN SUCH A WAY SO AS TO ALLOW
HIM TIME TO DO WHAT WAS NECESSARY ON THAT BUSINESS.</u>

17

18

19

20        Before entering into the first agreement with McDaniel in 2006 the commissioners

21   were well aware of the fact that he had a Christmas tree farm and occasionally needed to

22   work it. Piper dep., TR 65:6-66:12, 108:3-109:15 (Rosen); Sharon DeBuhr dep., TR 40:16-

23   41:11, 42:5-43:1 (Rosen); Dave DeBuhr dep., TR 57:11-21 (Rosen).  There is absolutely

24   no evidence supporting defendants' contention that some how McDaniel's tree farm

25

26        [9] McDaniel requests that the Piper statement not be considered because it is

27   hearsay.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18
[Case No. 3:10-cv-05120-RBL]

1    interfered with his responsibilities as chief. Piper dep., TR 64:4-16 (Rosen). In fact, Chief

2    McDaniel contracted with a crew that did the majority of the work for the tree farm.

3    McDaniel dep., TR 25:1-27:16 (Rosen).

4        Any amount of time or District resources McDaniel used for his tree farm is

5    infinitesimal. The District has produced a total of one email and an attached one-page

6    document. Macario decl., Exh. Q. McDaniel testified that he received very few calls a

7    year and that rather than carrying two cell phones it seemed to make more sense to carry

8    just one. He believed that the few phone calls that he received was consistent with the

9    employment agreement.   McDaniel dep., TR 194:11-19 (Rosen).   Dave DeBuhr

10   corroborated McDaniel as to the frequency of calls. Dave DeBuhr dep., TR 91:17-25

11   (Rosen).

12

13   G.   THE SURREPTITIOUS CREATION AND BACKDATING OF THE NOTES OF
         THE SEPTEMBER 10, 2008 ILLEGAL EXECUTIVE SESSION CREATES A
14       MATERIAL ISSUE WITH REGARD TO DEFENDANT DeBUHR AND
         DEFENDANT PIPER'S CREDIBILITY AND CALLS INTO QUESTION THEIR
15       MOTIVATION FOR EXCESSIVELY CRITICIZING AND FINALLY
         TERMINATING McDANIEL.
16

17       Defendants can point to absolutely no criticism of McDaniel's performance prior

18   to September 1, 2008. There is nothing in any minutes, nothing in any evaluations. No

19   evidence whatsoever. That all changed almost the day that defendant DeBuhr became a

20   commissioner. On September 10 there was an executive session with the chief in which

21   Sharon DeBuhr for the first time, and at her first meeting as commissioner, raised several

22   issues critical of McDaniel's performance and conduct. No notes were taken of that

23   meeting at that time nor was McDaniel ever given a copy of any notes or minutes. What

24   is in evidence, however, is what defendants call a "summary" of an executive session of

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 19
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    the board held September 8, 2008.  Macario decl., ¶ 18, Exh. Q.

2        The executive session was for the stated purpose of "considering personnel

3    issues."[10]  Unlike the notes in Exhibit Q to Mr. Macario's declaration, the executive session

4    was actually held on September 10, 2008.  Rosen decl., ¶ 8, Exh. 7 (District minutes

5    September 8, 2008.

6

7        Through discovery it was learned that this "summary" was not prepared until some

8    time in very late October 2008 and was done so through email communication between

9    defendants DeBuhr and Piper.  Piper dep., TR 136:12-139:8, 169:14-170:15 (Rosen);

10   Rosen Decl., Exhs.16 and 17.

11   H.    THE NOVEMBER 10, 2008 EVALUATION IS SO BAD AS TO BE
12         INHERENTLY INCREDIBLE.

13       In August 2008 the commissioners voluntarily increased McDaniel's annual salary

14   by 5% or $2,500.00.  Nothing in the contract required them to do so.  Three months later

15   the commissioners give him an annual performance evaluation at an executive session in

16   which he was given the lowest possible score in eight of nine categories and given the next

17   to worst possible score in the ninth.  Macario decl., Exh. R.  How McDaniel may have

18   possibly deteriorated from no criticism and a pay raise to this level of performance in less

19   than three months defies logic and creates another material factual issue both as to the

20   motivation of defendants as well as their credibility.

21

22

23   ───────────────

24   [10] It is improper for the fire district to identify the purpose of an executive
     session as discussing "personnel matters."  *The Open Public Meetings Act, How it*
25   *Applies to Washington Cities, Counties and Special Purpose Districts*, p. 23 (2008),
     Municipal Research and Services Center, Washington.  Rosen declaration, ¶ 12, Exhibit
26   11 at 23.  Further, under Washington law the commissioners are to state in advance the
     duration of the executive session and if necessary terminate the executive session to
27   announce that more time is needed.  *Id.* at 16.

PLAINTIFF'S RESPONSE TO DEFENDANTS'              THE ROSEN LAW FIRM
MOTION FOR SUMMARY JUDGMENT - 20                 Suite 1200 Hoge Building 705 Second Avenue
[Case No. 3:10-cv-05120-RBL]                     Seattle, WA 98104-1798
                                                 (206) 652-1464

Not coincidentally, the nine categories listed on the annual performance evaluation[11] match up to the nine bullet points in the "notes" created by commissioners Piper and DeBuhr in late October.  Macario decl., Exh. Q.  The narrative to the evaluation was prepared by either defendant DeBuhr or defendant Piper.  Sharon DeBuhr dep., TR 157:21-162:16 (Rosen).  There is absolutely no evidence that the evaluation was executed during any regular or special meeting of the board of commissioners.

Finally, the substance of the evaluation itself, that McDaniel was doing the worst possible job, is disputed by the testimony of Lenny Ryerson, Ricky Wood, Chris Weiland, and Dr. O'Neill, described in their depositions cited *supra*.  Even Dave DeBuhr acknowledge McDaniel's superb command skills.  D. DeBuhr dep., TR 35:24-36:17 (Rosen).

I.   THE JANUARY 12, 2009 "EVALUATION" IS DISPUTED BY McDANIEL'S RESPONSE DATED FEBRUARY 9, 2009.

An evaluation was handed to McDaniel after the board meeting on January 12, 2009 although absolutely nothing appears in the minutes suggesting that McDaniel was to receive this supplemental evaluation.  Macario decl., Exh. 5; Rosen decl., Exh. 18 (Minutes of the board meeting of January 12, 2009).  In this "evaluation" the commissioners revisit the "sick leave" issue going back to January 2008 when McDaniel was recuperating from the ATV accident.  McDaniel, in his February 9 response, Macario decl., Exh. T, challenged the accuracy of the allegations with regard to the sick leave issue among other things and reminded the commissioners that while he was on sick leave he was working

_____

[11] It is unclear who developed this evaluation form, where it came from, and when it was signed by the commissioners.  Certainly not at an open meeting where action must be taken.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 21 [Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

"from home taking care of all pertinent department business . . . . Within two weeks I was attending fire drills in a limited capacity and conducting department business.  As for adjusting time, I believe the hours worked were not work [sic] are correct."

J.   COMMISSIONER PIPER HAD NO AUTHORITY TO DEMAND ACCESS TO THE CHIEF'S COMPUTER ON JUNE 13, 2009 AND THE ACTIONS OF THE BOARD BETWEEN JUNE 13 AND 16 WERE ALL UNLAWFUL.

In accordance with the job description and duties appended to his employment agreement, McDaniel reported to the board of commissioners, not any one individual commissioner.   Macario decl., Exh. K, McDaniel-012-013.   While under ordinary circumstances one might have expected that McDaniel would provide her access, the fact remains that he was not required to do so under his employment agreement or any policy of the District.

The actions of the commissioners on June 14-16 were all unlawful besides being unreasonable.[12]  It is clear that the commissioners understood the notice requirement as evidenced from the notation on the notice of special meeting dated July 1, 2009.  Rosen decl., Exhibit 14.  Commissioner Piper testified that prior to June 13 McDaniel was always notified of any special meeting or changes in any regular meetings.  She also testified that the local newspaper was notified of special meetings "as long as we had advance enough notice."  She acknowledged that neither McDaniel nor the newspaper received any notice of the meetings on June 13-16.  She explained that the commissioners believed that "this was an emergency situation that needed to be dealt with at that time."  She identified the emergency as McDaniel's refusal "to allow access to the department computer."  Piper

---

[12] They were unlawful and null and void because no notice of special meetings was given to the media as required by RCW 42.30.060 and .080.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 22
[Case No. 3:10-cv-05120-RBL]

dep., TR 21:10-25:4 (Rosen).[13] No reason has been given for Piper's desire to access the computer other than she wanted to reimburse herself for some expenses she incurred on behalf of the county fire commissioners association.

There is no evidence that any emergency as defined by Washington law existed in June 2009 so as to absolve the District from the notice requirements in the statute.

Thus, not only was the directive to turn over the password an unlawful action,[14] so too the action of placing McDaniel on administrative leave.

K.    THE JUNE 21, 2009 EVALUATION IS OF NO FORCE AND EFFECT BECAUSE IT TOO WAS PREPARED AND SIGNED BY THE COMMISSIONERS DURING AN UNLAWFUL MEETING.

Although McDaniel was not due for another evaluation until the fall of 2009, the commissioners prepared an "annual" evaluation dated June 21, 2009. Macario decl., Exh. EE. It appears that it was prepared by commissioner Piper the day before. (See the date next to her signature on the last page of the document.) The evaluation was never given to Chief McDaniel. To the extent there was a special meeting on June 21, 2009, no notice was given to the newspaper. Rosen decl., ¶16, Exh. 15. The minutes of the special meeting mysteriously make reference to an evaluation dated June *19*, 2009. Rosen decl., ¶17, Exh. 16.

---

[13] State law allows for notice to be "dispensed with in the event a special meeting is called to deal with an emergency involving injury or damage to persons or property or the likelihood of such injury or damage, when time requirements of such notice would make notice impractical and increase the likelihood of injury or damage." RCW 42.30.080.

[14] Rendering it null and void.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 23
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

L.   NO ACTION WAS TAKEN BY THE BOARD TO TERMINATE McDANIEL.

There are no minutes in existence, certainly none produced by the defendants, that indicate that the board ever took final action with regard to McDaniel's status as chief or the termination of his employment agreement. All that is in the record is an unsigned notification of termination of employment dated August 4, 2009 purportedly prepared by the commissioners. A material issue of fact exists as to whether the District lawfully terminated McDaniel.

M.   THERE ARE MATERIAL FACTS IN DISPUTE WITH REGARD TO McDANIEL'S DEFAMATION CLAIM.

Defendants contend there was no publication of any defamatory statements because the Board was compelled to release the *Loudermill* notice pursuant to a public records request from the press. However, that begs the issue. There is a real question based on the totality of the evidence whether the commissioners knew when they prepared the *Loudermill* notice that the allegations it contained were false and misleading.

IV.   ARGUMENT

A.   SUMMARY JUDGMENT STANDARDS.

A moving party is not entitled to summary judgment unless, after viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of facts in dispute. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986).

> Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, where he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed and all inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 24
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    better course would be to proceed to a full trial.

2    *Liberty Lobby* at 255 (internal citations omitted); *Lytle v. Household Manufacturing, Inc.*, 494

3    U.S. 454, 110 S.Ct. 1331 (1990).

4         . . . although the court should review the record as a whole, it must disregard
5         all evidence favorable to the moving party that the jury is not required to
         believe.  That is, the court should give credence to the evidence favoring the
6         nonmovant as well as that "evidence supporting the moving party that is
         uncontradicted and unimpeached, at least to the extent that the evidence comes
7         from disinterested witnesses."

8    *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097 (2000)

9    (internal citations omitted).

10   B.      THE BREACH OF CONTRACT CLAIM.

11        1.      There are material issues of fact over whether the District lawfully
12        terminated McDaniel which preclude summary judgment.

13   Washington law is quite clear that:

14   (1) No governing body of a public agency shall adopt any ordinance,
15   resolution, rule, regulation, order, or directive, except in a meeting open to
     the public and then only at a meeting, the date of which is fixed by law or
16   rule, or at a meeting of which notice has been given according to the
     provisions of this chapter.  Any action taken at meetings failing to comply
17   with the provisions of this subsection shall be null and void.

18   (2) No governing body of a public agency at any meeting required to be
19   open to the public shall vote by secret ballot.  Any vote taken in violation
     of this subsection shall be null and void, and shall be considered an "action"
20   under this chapter.

21   RCW 42.30.060.  "Action" is clearly defined in the statute and incorporates such matters
22
     as giving directives, conducting reviews and evaluations, and taking any "final action" such
23
     as deciding to terminate McDaniel's employment.  RCW 42.30.020(3).  *See* "The Open
24
     Public Meetings Act," Report No. 60, May 2008, published by the Municipal Research
25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 25
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   Services Center of Washington for further explanation of the requirements of the law.[15]

2   Rosen decl., Exh. 28.

3       *Wood v. Battle Ground School District*, 107 Wn. App. 550, 27 P.3d 1208 (Div. 2,

4   2001) clearly articulates the illegality of the actions of Commissioners Piper and DeBuhr.

5   The court finds that emails between or among a quorum of the public body constitute a

6   "meeting." *Wood* at 1216 *et seq.*  The email correspondence between DeBuhr and Piper

7   in October 2008 discussing McDaniel's performance and behavior clearly fall within the

8   court's definition of "meeting" creating a factual issue regarding the legality of the Board's

9   actions and the motivation of Piper and DeBuhr.

10      2.   <u>Assuming that the District lawfully terminated McDaniel, there is a</u>
        <u>material issue of fact regarding whether it was still required to pay him his</u>
11      <u>salary as set forth in the termination section of the Agreement.</u>

12      Although certainly not clear, Article 13 of the Agreement contains language that

13  can reasonably be interpreted to mean that even where cause exists for termination "the

14  District shall be held liable for the annual salary till [sic] the expiration of this Agreement."

15  This is a significant material factual dispute because under Washington contract law all

16  words and phrases are to be given meaning.   Under Washington law the contract

17  interpretation is governed by the context rule of the Restatement (Second) of Contracts,

18  §§ 212, 214(c) (1981). *Verizon Northwest, Inc. v. Worldcom, Inc.,* 61 F. Appx 388, 392

19  (9th Cir., 2003) citing *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222, 229-230 (Wash.

20  1990).   Importantly, a "question of interpretation of an integrated agreement is to be

---

[15] The Municipal Research and Services Center of Washington is a private non-profit organization providing service to local government throughout the state of Washington.  More information can be found at www.mrsc.org.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 26
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. *Berg* at 229. Extrinsic evidence can include "the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1118 (9th Cir., 2001). Based on the totality of the evidence here, a material question of fact exists as to whether the District is required to pay McDaniel unless it could prove gross misconduct, insubordination or criminal activity.

       3.    <u>A question of material fact exists as to whether McDaniel was insubordinate.</u>

Defendants cite *Stastny v. Board of Trustees of Central Washington University*, 32 Wn. App. 239, 247, 647 P.2d 496 (1982) as the court for a definition of insubordination. That case is distinguishable, first because the cases cited all involve teachers and, second, and more importantly, because it is distinguishable on its facts. The operative terms in the definition are "willful refusal" and "reasonable rules." Here, McDaniel disputes both the willfulness of his conduct, i.e., he never actually refused to provide the password to his computer, rather he wanted to seek legal advice to understand his obligation to do so and under the totality of the circumstances the directive was neither reasonable nor lawful.

Black's Law Dictionary defines insubordination as "1. [a] willful disregard of an employer's instructions . . . . 2. An act of disobeyance to proper authority; esp., a refusal to obey an order that a superior officer is authorized to give." Black's Law Dictionary, 802 (7th Ed.) (1999), cited in *Carson v. South Carolina Department of Natural Resources*, 638

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 27
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

S.E.2d 45, 47 (2002).   There is substantial evidence that McDaniel did not willfully disregard his employer's instructions and there is also substantial evidence that neither the Board on June 15, nor Piper on June 13, was authorized to direct McDaniel to divulge the password. Lastly, no harm or detriment occurred because of McDaniel's reluctance to turn over the password to individuals who, based on their record, he had great reason to distrust.

    4.    <u>Questions of fact abound as to whether McDaniel performed his duties at an unsatisfactory level.</u>

In order to terminate McDaniel for "incompetence [sic], inefficiency or inattention to or dereliction of duty" there must be specific facts to support the allegations. Here, none exist that are not countered with credible testimony of disinterested witnesses in addition to McDaniel himself.   Indeed, the whole record wreaks of surreptitious and deceptive behavior on the parts of defendants DeBuhr and Piper to discredit McDaniel who had served the District loyally and passionately for over forty years.   For him to have become incompetent overnight is incredible.   McDaniel has never claimed to be perfect.   But that is not what the contract requires.   Rather, it required him to work to standards expected in the community.   Here, the community is small and rural.   The fire fighters and EMTs are all volunteers.   As Kris Weiland, Chief of a neighboring district, testified:

> Well, you know, the problems you're faced with is your staffing is usually very short.   There's a lot of things that need to be done, a lot of maintenance and repairs and paperwork and training and just a wide variety of things, and you have a very limited number of people to work with to accomplish some of these things.   And it's very hard, at times, to get everything done because you're basically overwhelmed with what needs to be completed.

Weiland dep., TR 38:20-39:3 (Rosen). Duran McDaniel said it somewhat differently:

> Just how – how should I say this?   I'm trying to figure out how to say this properly.   You have a local board that was raised here, so they've known

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 28
[Case No. 3:10-cv-05120-RBL]

Phill all their lives, and then we've had a change of board, so there's a trust and a culture change of how the board looks at things.  I think at times, and I can't speak to exactly how, but there was a different climate of how the relationship between the board and the chief worked.  I think they had different expectations, and I don't know if they ever quite got to the point that they understood each other's expectations.

W. Duran McDaniel dep., TR 16:10-20 (Rosen).

It may be true that Commissioners Piper and DeBuhr had different expectations. However, they had no power to change the terms of the employment agreement or McDaniel's duties and responsibilities mid-term.

> 5.   McDaniel's "use of public resources" was both de minimis and allowable under his employment agreement.

McDaniel made perhaps one cell phone call a month, at most.  He sent one email – to himself – that did not involve District business but rather his tree farm.[16]  That he owned the tree farm and would be required to do some work was an integral part of the understanding of the parties when negotiating the employment agreement.  Even with seasonal work that he would sometimes do at the Christmas tree farm, he worked many many hours more than 173 per month he considered the "magic number."  "Comp time" was allowable until Sharon DeBuhr became a commissioner in September 2008.  There is no evidence that McDaniel worked less than the requisite number of hours expected of a full-time fire chief or that he ever failed to perform any required tasks because he was distracted by his farm.  Allegations to the effect that he wasn't at his office were countered by the fact that he was often at meetings within the county that he was encouraged to attend

---

[16] An ALJ of the Office of Administrative Hearings awarded unemployment benefits to McDaniel finding that neither McDaniel's response to the request for the password or his de minimis use of District property amounted to misconduct.  Rosen decl., Exh. 31 (Initial Order dated December 1, 2009).

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 29
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

or was at one of the four remote stations over which he had day-to-day responsibilities as well as the main fire station in which his office was located.  Even if a trier of fact could conclude that the de minimis usage of the District's cell phone and computer amounted to a violation of RCW 42.23.070(1) or RCW 42.56.160, there is absolutely no evidence that McDaniel's conduct would arise to "criminal activity" or that the usage amounted to cause.[17]

C.   ISSUES OF MATERIAL FACT REGARDING DEFENDANTS' MALICE AND BAD FAITH PRECLUDE SUMMARY JUDGMENT ON McDANIEL'S DEFAMATION CLAIMS.

RCW 42.56.060 only shields agencies and its officers from liability where it can be shown that the complained of actions it took were in good faith.  Although McDaniel has been unable to locate any cases interpreting the statute, its clear intention can be gleaned from its text.  There must be "good faith" before the shield can be deployed.

There is ample evidence here that the District, acting through its commissioners, did not act in good faith.  Rather, as of September 8, 2008, the evidence described above is directly to the contrary.  While it may be true that the commissioners did not make direct defamatory statements to the media, they did release the *Loudermill* notice to the press knowing that the vast majority of the accusations were false and injurious to McDaniel's reputation and ability to obtain other employment.  The very notions of malice and good

---

[17] The employment agreement does not require termination for cause.  It states, rather, that McDaniel "may" be terminated for the specified reasons set out.  The word "may" must be distinguished from the mandatory "shall."  Certainly, under the context rule in *Berg*, it must be viewed as providing for a reasonableness determination before McDaniel would be fired.  While the District attempts to place the "drafting" responsibility on McDaniel, it is clear from the record that he does not have to shoulder that burden as it was not only co-drafted by the District Secretary but reviewed by counsel for the District.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 30
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

faith require determinations by a trier of fact and cannot be decided as a matter of law.  *See Wood v. Battle Ground School District, supra*, at 567 *et seq.*  By virtue of the fact that all evidence must be viewed in a light most favorable to the non-moving party, this claim should not be denied especially when one looks at the box appearing in the August 29, 2009 edition of *The Chronicle* which follows exactly the fabricated "summary" of the September 10, 2008 executive session, not prepared until late the following month by DeBuhr and Piper in surreptitious, unlawful email communications.   Macario decl., Exh. RR, McDaniel-402.

## V.  CONCLUSION

McDaniel has presented substantial credible evidence that cause as set forth in his employment agreement did not exist when he was terminated on August 4, 2009.  He has presented facts that create material issues regarding whether any of the significant actions taken by the commissioners were valid.  He has presented substantial facts creating a material issue as to whether Commissioners DeBuhr and Piper acted in good faith and without malice and reckless disregard of the truth.  Based on the foregoing his breach of contract and defamation claims should proceed to trial and defendants' Motion for Summary Judgment as to those claims should be denied.[18]

---

[18] McDaniel does not challenge the motion with regard to his public policy and federal civil rights claims.  Plaintiff requests that given the posture of this case, less than three months before trial, that the court exercise its discretion to retain jurisdiction over the state law claims.  *First & Beck, a Nevada LLC v. Bank of Southwest*, 267 Fed.Appx 499, 501-02 (9th Cir., 2007); *Scott v. Pasadena Unified School District,* 306 F.3d 646, 664 (9th Cir., 2002); 28 U.S.C., § 1367(c).  Plaintiff, of course, did not plead §1367 supplemental jurisdiction since this matter was originally filed in state court and removed by defendants.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 31
[Case No. 3:10-cv-05120-RBL]

1    Respectfully submitted this 28th day of February, 2011.

2                              THE ROSEN LAW FIRM

3

4                    By:    /s/ Jon Howard Rosen
                            Jon Howard Rosen, WSBA# 7543
5                           Attorney for Plaintiff Phillip McDaniel

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 32
[Case No. 3:10-cv-05120-RBL]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464